The next case is 17222 in Re Conner Okay, are we ready? Mr. Blankenship Good morning, your honors. My name is Keith Blankenship. I'm the appellate attorney for Conner et al. I have a client that discovered something that was very special about laser beam dynamics in the creation of electrodes for very, very tiny batteries. I say that Conner only addressed Newman in making his arguments directed at claims 10 to 17, which contained the laser pulse limitation, and not claims 6 to 9. Am I correct that Conner agrees that patentability of claims 6 to 9 rise and fall with our determination as to claim 1? Yes, your honor. And when I say tiny, I mean very, very tiny. I'm sorry to have littered my brief with exclamation points everywhere when talking about things so incredibly small, but you almost have to change your mode of thinking. In the red brief at 19, the PTO points out the procedural posture of claim 5 and claims 6 to 9 specifically with respect to where the PTAB states that claims 6 to 9 will be canceled in an amendment contemporaneous to the filing of this brief. Did Conner ever file that contemporaneous amendment? I look toward the record, your honor, and the answer is no. And because the board dealt with all of the claims 1 through 17, we dealt with them as well. So why shouldn't we find Conner's arguments related to separate patentability of 6 to 9 waived then, given your answers to the last two areas? The short answer, your honor, is I'm not familiar with that scenario and how it would be treated, but if that's applicable, then that's the way it must be. Offhand, I don't know of case law that stands for the proposition that they have to be included because the board does discuss them. In the reply brief at 12, Conner argues that Brennan does not, I'm quoting, does not support the proposition that is of ablation of through holes, save a single reference at column 13 lines 19 to 20. But Brennan discloses the practice of laser pulses to ablate through holes, both at column 21, column 2, line 27, and again at column 4 of lines 8 and 9. Where in the record can you provide proof of evidentiary support for your argument that Brennan is not dispositive? That Brennan is not dispositive of the issue that there are through holes in a membrane or dispositive of... When I went back in the red brief, appellees discussed numerous references where they believed that they saw Brennan putting through holes, channels, into materials. I went back and I looked at them and what I found out is that most, what they talked about in that one area where I mentioned it was through the mask. Now what Brennan is discussing, so my client is shooting directly onto a membrane, but in several situations what Brennan is discussing is there's a membrane, there's a laser, and there's a mask in between the laser and the membrane. And the through holes are in the mask and not the membrane. And that's what he's discussing in most of the situations. One of them, one of the discussions of a through hole was accurate, that's right. However, Brennan is not discussing through holes in terms of creation of a membrane. Brennan is discussing the roughening of a surface and it can have and it can go all the way through a surface. All right. It can go through the membrane. Yes. Then what's your point? Our point is, Your Honor, that my client is creating cell membranes and they're fixing the ablation to do it. And they're using an ablation value that adeptly cuts through the entirety of the surface to create very, very, very small membrane channels. And doing it at a range that Brennan does not disclose. We're not saying that people are not cutting holes through membranes. That's what a membrane is. That's what all membranes are. My client is doing it in a very, very special way at a very precise ablation value in a way that we've sort of coined. We're fixing the ablation value to be such that it just, not only does it barely create a hole, but is creating a hole that is smaller than the diameter of the laser beam itself. I think in my brief I mentioned it's like hitting a wall with a sledgehammer and looking at the wall and realizing the hole we just put in there is smaller than the sledgehammer head itself. And that's what's special about the claims. That is what we're seeking. And that is not found in Brennan. Brennan describes, Brennan fits into what we see in the prior case law for the unlimited range or nearly unlimited range of values. Brennan sort of offhandedly mentions that, by the way, in order to make a hole you must use the amount of power that it takes to make a hole. We don't consider this very profound. And it's offhand, it's limitless. It does not have an upper range limit to it. And in cases like this, this court has previously dealt with ranges that are unlimited or so large as to be unhelpful to a person born near a skill in the art in working their way towards the claim of invention. This court has disregarded, has deemed them as not good evidence, not part of a prima facie case. And that's one of the procedural issues that we have in this, Your Honor. The court looked at the range. Brennan says, well, you have to use enough energy to make a hole and every material has an ablation value, has an ablation threshold, so it's got to be more than that. So the board and the examiner looked at that statement and said, well, because it discloses an infinite range, and your range is in that infinite range because you are making a hole. Therefore, you fit into the Peterson category of, this is enough to claim that a prima facie case of obviousness has been established. But we disagree. We don't think that Peterson stands for that proposition at all. We see this in the In re Baird Genetics Institute. It's almost like a railroad track, in our opinion. That if the claim is, if the range is so large to be unhelpful, railroad track sends it over to the Baird Genetics Institute line of cases. If that range is, has a finite and has guidance and has some way of pointing the person of ordinary skill in the art towards the claim of invention, then it goes into Peterson and it does establish a prima facie case. Where did you produce evidence from Brennan or elsewhere to support your, what is, you're argument that setting an ablation value of four or less was critical to the claimed invention or led to unexpected results concerning the uniformity of holes to be ablated? The evidence for that is in the specification itself where we talk about the incubation effects. Where we talk about you cannot simply blast a hole over and over and over again because when you do that, you are, every time you hit a spot with a laser beam, you are making it more and more impervious to ablating it with a laser beam, the incubation effects. But also in a topic that's very related to what you just asked, the criticality, in the art in saying that in an infinite range of values, it's wrong and misplaced procedurally to put the onus of supplying criticality onto the applicant. At the very end of Stepan, it describes that if there's an unhelpful range, unlimited range of values. What you're asking is to make an assumption as if it's not contested and completely true, which is that this is an infinite range. But that seems an exaggeration to me. I mean, Brennan expressly discloses an upper limit to his preferred ablation levels. I mean, it's not an infinite range. I don't understand why you're saying it's an infinite range. So there are two parts of Brennan. The first part and the part that the board and the examiner use was that offhand remark where it says, to make a hole, you must use enough energy to make a hole. And then Brennan describes the surface roughening that he is doing, and he gives values for that. Now, if you, and we dealt with this in the brief. Now, if you were to look at the values that Brennan describes that he is using, those result in features that are many thousands of times greater than the results that my client is getting. Therefore, if you look at it as, if you look at Brennan as, if you take the part that has infinite range, yes, we fall into it. But we say that that's irrelevant. But if you look at the part of Brennan where he is doing the surface roughening and he does give the details, then we do not fall into that. So it's almost, on one hand, infinite range, we fall into it, but we think that's procedurally wrong. On the other hand, if you look at the actual variables that he is giving for what he is doing, we don't fall into that. We're creating membranes that are thousands of times smaller than his mistakes. You know, when he's talking about the deviations, what he's saying is that we're making mistakes that are this big in difference from one to the other. And our membranes are so much smaller, not even the mistakes from those features. Let me read to you from your brief. Yes, Your Honor. I'm at page 24 of the blue brief. Yes, Your Honor. I'm sorry, is this the first or the second? The black brief. Blue brief. First full paragraph. Okay? This Court's jurisprudence on the topic of ranges can be appealed to the following principle. An overlap in ranges between and lest they occur if the claim range lies within a disclosed range. Are you following me there? That is gibberish. Yes. It's authentic gibberish. Yes. No one on this Court ever said that. That's clearly a cut-and-paste error. My apologies for that. One marginal note says, do you actually care how this case comes out? Certainly. Submitting that in a brief? I didn't look at the difference between the actual Microsoft Word version that I submitted and then the PDF that resulted from it. But, you know, what's meant to be here is that if there's an overlap, Peterson stands for the principle, that if there's an overlap in ranges and the claimed range falls wholly within that range, then it's generally considered that it's probably obvious. But we believe that genetics institute stands for a proposition that's different if it's unlimited. And I see that I'm into it. Yeah. Why don't we hear from the government? Thank you, Your Honors. Thank you. Good morning, Your Honors. Thank you. May it please the Court. I wanted to begin by talking about a couple of questions you had had to Appellant's counsel. There was some discussion about whether or not Brennan discloses through holes. Well, let me do a housekeeping question for you. Certainly. Which I basically asked your opposing counsel. In the red brief at 19, you point out, you point to the record how Connor told the PTAB, quote, claim 6 to 9 will be canceled in an amendment contemporaneous to the filing of this brief. And it goes on to say that because Connor didn't follow through, the PTAB didn't address 6 to 9 separately. In view of SAS, do we have an SAS issue arising from the fact that the PTAB didn't address each of the examiner's grounds of rejections as raised initially by Connor? I think the way the PTAB did it is kind of interesting because, you know, although Connor did say that he was going to withdraw claims 6 through 9, the PTAB actually said in a footnote on page 1 of their decision that they were going to consider it because they hadn't seen the amendment yet to withdraw 6 through 9. So this is kind of an interesting case. I'm not exactly sure whether this is waived or not. But even if it's not waived, he clearly defended 6 through 9 solely on the grounds that he defended 1 through 4. Yeah, it still falls within 1. Right. The posture is so weird. It is. I agree with that, Your Honor. I wanted to mention that it's pretty clear if you look at the drawings in Brennan that it's not just through the mask. If you look at pages, for example, in the appendix at 243 through 248, there are actual visual representations of through holes through the substrate. So it's very clear that Brennan does both surface texturing and through holes, and that's contemplated by the prior art. The second thing is there's a lot of mention, and I think as Your Honor has pointed out, it's mostly attorney discussion, that the claimed invention does not give rise to incubation effects, which are said to diminish the quality of the holes that are being drilled. What I wanted to point out is that there is, in fact, no evidence that there is any difference between the claimed invention and any of the prior art in that regard, and Brennan specifically mentions as well that if you use short pulses, you're not going to have heat propagating through the non-ablated part of the substrate. So I think that that's the site for that, in case you want to look it up, is column 13, lines 59 through 65 of Brennan, which is on appendix 255. I couldn't find any place where it was not attorney argument. Well, that's true. I think we pointed out in our brief that there was basically no evidence whatsoever that was rebuttal evidence provided to the prima facie case that was made out by the examiner. And the final thing I wanted to point out was that he talked at the end of his argument about how small the size is compared to his client's invention versus that in Brennan. There's absolutely no claim limitation whatsoever in the application about the size of the holes being ablated. It's a very general just ablate at a particular laser fluence. If there are no further questions, thank you very much. If I can pick up right where Kelly's counsel left off, but the size is directly determined by that ablation value that we're putting into the claims. It's a consequence of it. As that ratio draws closer to one to one, the diameter of the holes is shrinking. But the board never really considered the diameter of Brennan and the diameters of the other prior art. They considered depth. And in doing that, they erred. Additionally, they did not consider the ideas. One of the propositions of this court is sometimes the idea itself is the invention. And the board had nothing but other than conclusory remarks of how to of the significance of having the rows of membranes equally sized. And one of the things I tried to emphasize is that for larger batteries, there are so many membrane channels that statistically, they will be approximately the same or within a variance. But that's for running, you know, for toys or electronics or something that you can feel or hold. But when you're developing machines that are comparable to, say, the size of a grain of rice or hearing aids, well, it may be necessary that you're not firing off thousands of ions through membrane channels. But instead, you may need to activate 10, 15, or in extreme cases, one ion through a membrane channel at a time. And when you do that, the regularity is not controlled by statistics anymore. The regularity is controlled by the actual physical diameter of what it is you've done. And in cases where you're creating a battery that requires regular performance for some sort of critical function, if you don't want to destroy a very, very small circuit, there should be regularity in the membrane channels to ensure that there is a regular amount of energy output. And that's the invention that was conceived of by my client for claims, say, 10 through 17. It just is not found in the prior art. All that's found is that, well, we could do it, but don't forget, this isn't just a case about laser ablation. This is a case about creating a battery membrane. And the function matters and the purpose matters. Thank you.